IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| BRANDY ROSE BLOND, <br><br> Plaintiff, <br><br> vs. <br><br> FRANK BISIGNANO, Commissioner of SSA; <br><br><br> Defendant. | 8:25CV570 <br><br><br> **MEMORANDUM AND ORDER** |

Plaintiff Brandy Rose Blond seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final administrative decision of the Commissioner of Social Security ("Commissioner"). Plaintiff filed a Motion for an Order Reversing the Commissioner's Decision and brief in support of the motion. (Filing No. 16). The Commissioner filed a Motion to Affirm the Commissioner's Decision. (Filing No. 17). The parties consented to the final disposition of this case by the undersigned magistrate judge pursuant to 28 U.S.C. § 636(c)(1). (Filing No. 15). Being duly advised in the premises, the court now finds that Plaintiff's motion to reverse and remand should be denied and that the Commissioner's motion to affirm be granted.

## I.    PROCEDURAL BACKGROUND

On July 12, 2021, Plaintiff filed a Title II application for period of disability and disability insurance benefits. Plaintiff also protectively filed a Title XVI application for supplemental security income on July 12, 2021. (Filing No. 8-5). Plaintiff alleged disability beginning November 2, 2019. Those applications were denied on May 6, 2022, and denied

1

upon reconsideration on April 5, 2023. (Filing No. 8-4 at 8-12, 29-31). Plaintiff requested an administrative hearing on May 12, 2023. (Filing No. 8-4 at 44-45). The hearing was held on February 26, 2024, and Plaintiff appeared telephonically with counsel. (Filing No. 8-2 at 16). The ALJ issued an unfavorable decision on August 26, 2024. (Filing No. 8-2 at 13-33; Filing No. 8-2 at 41-64). On July 16, 2025, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (Filing No. 8-2 at 2-7). Plaintiff filed this action for review of the ALJ's decision on September 18, 2025. (Filing No. 1).

## II.    FACTUAL BACKGROUND AND MEDICAL EVIDENCE

Plaintiff was born on June 14, 1986, which is defined as a "younger individual" under the statutes, and she has at least a high school education. With respect to the medical records and other evidence of record, the court adopts Plaintiff's recitation of facts set forth in her Statement of Material Facts (Filing No. 16-1 at 2-3), and as agreed to by the Commissioner. (Filing No. 18 at 2).

Plaintiff's motion focuses primarily on the evidence related to her migraines, so the court will briefly summarize those facts here. Plaintiff's medical records indicate she saw Neurologist Dharani Mudugal, M.D. on February 12, 2021, and reported a history of migraines and a constant headache which began on February 2, 2021. (Filing No. 10-1 at 175). According to treatment notes, Plaintiff underwent a CT scan which showed normal attenuation of the gray and white matter, "no sign of acute or chronic cortical infarct," no hemorrhage, mass, or edema. (Filing No. 10-1 at 177). The doctor planned to obtain an MRI and counseled Plaintiff on migraine treatment and medication options. (Filing No. 10-1 at 178). Plaintiff's brain MRI on February 16, 2021 was normal and unremarkable. (Filing No. 10-1 at 181-182). Mudugal's progress notes on March 5, 2021, indicated Plaintiff's headaches had improved overall and she had been headache-free for the last two days. (Filing No. 10-1 at 179). Plaintiff was prescribed preventative and abortive medication.

2

Plaintiff went to the emergency room in early September 2021, and reported coughing fits and migraine after inhaling smoke from a burning electrical outlet. She was diagnosed with pneumonia and followed up with Shannon Buster, P.A., on September 22, 2021. (Filing No. 10-1 at 252). Plaintiff went to the emergency room on April 26, 2022, with report of a headache made worse by bright lights, loud noises, and smells. (Filing No. 11-1 at 358). Progress notes indicated she "[f]elt better after headache cocktail." (Filing No. 11-1 at 364). Plaintiff went to the emergency room on May 16, 2022, for "chronic migraine headache and chronic back pain." (Filing No. 11-1 at 370). Neurological notes indicated Plaintiff was alert and oriented, but she was noncompliant with the neurological exam, as she was "laying in bed with a shirt over her head due to her headache." (Filing No. 11-1 at 376). She was treated with a migraine cocktail and a small dose of morphine for her back pain, and reported "feeling much better" before discharge. (Filing No. 11-1 at 377). She was referred for a follow up with her primary care physician for further evaluation. Plaintiff had another visit with Buster for an evaluation of migraines on June 3, 2022. She reported symptoms including neck stiffness, eye pain, photophobia, phonophobia, smell sensitivity with nausea, and radiating pain in her face/jaw/teeth. (Filing No. 10-1 at 205). Plaintiff also reported increased migraine frequency due to persistent stress with her ex-boyfriend.

Plaintiff went to the emergency room on July 8, 2022, reporting she got her foot caught, fell and hit her head. She was observed to have symmetric strength in her extremities. (Filing No. 11-1 at 389-391). At a subsequent visit on July 26, 2022, Plaintiff reported concussive symptoms of headache and neck soreness from a fall which occurred when she tripped on a tote. (Filing No. 11-1 at 418). At another visit on July 31, 2022, Plaintiff reported head and neck pain related to a fall from standing height when she was bent over trying to play with a dog. (Filing No. 11-1 at 424). She was observed to move all four extremities without difficulty and without any appreciable focal neurological defects. (Filing No. 11-1 at 431-432). The provider noted her speech cadence and overall demeanor changed throughout the conversation and "question[ed] if there is some component related

3

to the patient's effort today." (Filing No. 11-1 at 431). The provider also expressed concern with some potential drug-seeking behavior:

> RN discharged patient and informs me that in doing so, the patient started screaming and yelling at him, using profanity as well, stating that she was in immense pain and needed pain medications. Security notified. This is markedly different than her initial presentation here to me when she would not answer questions when I initially asked her of her concerns that brought her in initially today and was very slow to speak. Patient has narcotics listed on her home medication and as such, I have not prescribed any additional narcotic pain medications for her. With the drastic nature here in the emergency department that she is exhibited to myself as well as the RN, I do have some concerns for drug-seeking behavior. Here today, the patient does not appear to have a limb or life threatening injury or an emergency that requires admission here to the hospital and as such, is stable for discharge.

(Filing No. 11-1 at 432).

Plaintiff visited the emergency room several more times, including on September 13, 2022 (reporting mild to moderate headache); October 20, 2022 (reporting she was playing on floor with kitten, got up became light headed upon standing and "passed out," hitting her head on the coffee table); October 21, 2022 (reporting she was struck in the face by a dog); and December 5, 2022 (reporting she fell over dog gate). (Filing No. 11-1 at 459, 470, 487, 623). Buster's treatment notes dated February 2, 2023, noted there was "confusion" at an ER visit on January 17, 2023, where the ER physician determined she was "drug seeking" due to miscommunications between the ER and her regular providers. Buster noted that she had not seen drug seeking behavior from Plaintiff, but "her frequent ER visits (for various issues but mostly pain of some sort) over the last year could be perceived this way by providers that do not know her well." (Filing No. 12-3 at 290).

Plaintiff's list of medications is extensive, so it will not be set forth in detail here. (*See* Filing No. 11-1 at 631) (list of medications prescribed or previously prescribed, as of December 5, 2022). Specific to treatment of migraine and migraine symptoms, Plaintiff's medical records indicated that at various times she had been prescribed diphenhydramine

4

(BenadryL), Promethazine (Phenergan), SUMAtriptan (Imitrex), Emgality, Ubrelvy, Nurtec, and Topiramate.. (Filing No. 9-1 at 584-585; Filing No. 12-3 at 137).

On appeal, Plaintiff alleged increased pain and increased migraine frequency. (Filing No. 8-2 at 22, citing Filing No. 8-6 at 44, Filing No. 8-2 at 29; 8-3 at 27). The ALJ considered Plaintiff's testimony during the hearing, including that she takes preventative medication, which has not been helping, and takes another medication when headaches start. (Filing No. 8-2 at 56). Plaintiff also testified at her hearing that she has migraines three to four times per week and that she soon planned to switch to Botox at her next medical appointment. (Filing No. 8-2 at 23, 56-57).

### III.    ALJ FINDINGS

The ALJ evaluated Plaintiff's claim using the "five-step" sequential analysis prescribed by the Social Security Regulations.

> At the first step, the claimant must establish that he has not engaged in substantial gainful activity. The second step requires that the claimant prove he has a severe impairment that significantly limits his physical or mental ability to perform basic work activities. If, at the third step, the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits. If the claimant cannot carry this burden, however, step four requires that the claimant prove he lacks the RFC [or Residual Functional Capacity] to perform his past relevant work. Finally, if the claimant establishes that he cannot perform his past relevant work, the burden shifts to the Commissioner at the fifth step to prove that there are other jobs in the national economy that the claimant can perform.

*Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006) (citing 20 C.F.R. § 404.1520(a) and 416.920(a)).

The ALJ found at step one that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2024, and that she had not engaged in substantial gainful activity since November 2, 2019, the alleged onset date. (Filing No. 8-2 at 19).

At step two, the ALJ found that Plaintiff had the following severe impairments: osteoarthritis of bilateral hips, neuropathy, piriformis syndrome, degenerative disc disease, mood disorder, and anxiety disorder. (Filing No. 8-2 at 19). The ALJ also recognized that Plaintiff had non-severe impairments including kidney stones, migraine headache disorder, and syncopal episodes. The ALJ concluded that Plaintiff's migraines were in the category of these "non-severe" impairments, as they did not cause more than minimal limitations on her ability to do basic work activities. (Filing No. 8-2 at 19). The ALJ noted further, however, that she considered both severe and non-severe impairments "in the residual functional capacity as necessary taking into account the totality of the record." (Filing No. 8-2 at 19).

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526, 416.920(d), 416.925, and 416.926). (Filing No. 8-2 at 19).

In determining Plaintiffs' residual functional capacity (or RFC), the ALJ followed a two-step process. This two-step process requires the ALJ to first determine whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's pain or other symptoms. Once such impairment is shown, the ALJ must next evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. *See* 20 C.F.R. § 404.1529; SSR 16-3p. The ALJ here considered "the entire record" including all symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical evidence and other evidence. (Filing No. 8-2 at 21). The ALJ also considered the medical opinions and prior administrative findings. (Filing No. 8-2 at 21). The ALJ noted Plaintiff's alleged physical and mental conditions including "back problem; hip problems; piriformis syndrome; peripheral neuropathy; osteoarthritis in hip; sciatica; depression; anxiety disorder;

adjustment disorder; and possible PTSD", as well as Plaintiff's allegation of increased pain and migraine frequency. (Filing No. 8-2 at 21-22).

Notwithstanding these limitations, the ALJ found that Plaintiff has the capacity to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a), except she can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs, and balance, stoop, kneel, crouch, and crawl; should avoid exposure to workplace hazards, such as unprotected heights and dangerous moving machinery, and avoid concentrated exposure to temperature extremes, witness, and vibration. (Filing No. 8-2 at 21). The ALJ found Plaintiff was able to perform low stress work, defined as work that requires only occasional decision making and adapting to workplace changes; she should avoid bright or blinking lights, as well as concentrated exposure to smoke and obnoxious fumes. (Filing No. 8-2 at 21). She should be allowed occasionally the use of an ambulatory aid. (Filing No. 8-2 at 21).

In considering Plaintiff's mental and neurological symptoms, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record…." (Filing No. 8-2 at 23). The ALJ noted that neuropsychological testing in March of 2022, yielded no valid data, due to suboptimal task engagement. (Filing No. 8-2 at 25; Filing No. 10-1 at 75). The ALJ also noted "At an emergency room visit in July 2022, after complaint of fall, she reported 'immense' headache and neck pain, but was observed to move all four extremities without difficulty, without any appreciable focal neurological defects." (Filing No. 8-2 at 25; Filing No. 11-1 at 432). The ALJ further noted records indicating that Plaintiff's speech pattern changed significantly when answering questions regarding her pain, with no slurred speech or word finding difficulties. (Filing No. 8-2 at 25; Filing No. 11-1 at 432). Brain MRIs showed no acute findings. (Filing No. 8-2 at 26).

The ALJ evaluated the medical opinions and prior administrative medical findings as to all of Plaintiff's symptoms to form an RFC determination. One of Plaintiff's treating physicians, Shannon Buster, PA-C, submitted a statement in June 2021, opining that Plaintiff was able to walk for one block; sit for four to six hours; stand/walk for three hours; required unscheduled breaks for 5-10 minutes every hour, frequently lift and carry less than 10 pounds and occasionally lift and carry 10 pounds. Buster opined Plaintiff would be absent from work 3-4 days per month due to her impairments. The ALJ agreed that Buster's postural limitations were warranted as were limitations on exposure to workplace hazards due to complaints of pain and mobility difficulty.

The ALJ also found limitations on exposure to workplace stressors was warranted based upon mental status examination findings, and limitations on exposure to bright or blinking lights was warranted due to intermittent complaints of migraine throughout the record. (Filing No. 8-2 at 26). The ALJ found, however, that certain limitations (particularly the need for unscheduled breaks and absences), was less persuasive and unsupported by the findings documented at primary care examinations. Those complaints were primarily subjective and not fully supported by the objective evidence in the record. (Filing No. 8-2 at 26). The ALJ noted the neurology examination showed no cognitive impairment, the gait examination showed ability to walk without a cane and forward and backward without difficulty, and the EMG of the right upper extremity showed no evidence of right median neuropathy.

After the hearing, medical expert interrogatories were obtained from Jason Lin, M.D., a neurologist who reviewed the medical evidence and provided a "Medical Statement of Ability to Do Work-Related Activities (Physical)." (Filing No. 12-4 at 37-42). Lin reviewed Plaintiff's hip strength, surgical procedures and pain interventions. (Filing No. 8-2 at 26-27). He also reviewed the emergency room records which noted Plaintiff was alert, oriented to time and place, had normal speech and normal range of motion, had "no obvious focal neurologic deficits" and "no visual or hearing impairment." (Filing No. 12-4 at 37-42). Dr. Lin opined that Plaintiff was limited to a light exertional level, in particular

that she was "able to lift and carry up to 20 pounds frequently, and up to 50 pounds occasionally; sit for four hours at a time for a total of eight hours; stand for two hours at a time for a total of three hours; walk for one hour at a time for a total of two hours; and did not require a cane for ambulation." (Filing No. 8-2 at 27). Dr. Lin did not provide an opinion as to Plaintiff's migraines. The ALJ found Dr. Lin's opinions to be somewhat consistent with the record as a whole, but found the opinions to be less persuasive in that Dr. Lin did not consider "the claimant's subjective and consistent complaints of right hip pain." (Filing No. 8-2 at 27). The ALJ accordingly found additional limitations were warranted and supported by the record, which were incorporated into Plaintiff's RFC.

State agency medical consultants also concluded that Plaintiff was able to perform light work with four hours of standing/walking and six hours of sitting, and occasional climbing. The ALJ found these recommendations were somewhat supported and somewhat consistent with the record as a whole, but only somewhat persuasive. (Filing No. 8-2 at 27). The ALJ again concluded that the recommendations did not adequately consider plaintiff's subjective complaints. The ALJ accordingly included in Plaintiff's RFC additional limitations to a "reduced range of sedentary work, with further postural and environmental limitations[.]" (Filing No. 8-2 at 26.

Abbey Jones, Licensed Independent Mental Health Practitioner (LIMHP), submitted a statement in July 2021, and opined that Plaintiff had "extreme" limitations in adapting to changes and marking limitations in sequencing multi-step activities, initiating and performing known tasks, working at an appropriate and consistent pace, or completing tasks in a timely manner. (Filing No. 8-2 at 27). The ALJ found the extent of limitations opined by Jones was not supported by the findings documented in mental health examinations and was inconsistent with the record as a whole. (Filing No. 8-2 at 27). The ALJ referenced, for example, examinations in March and December 2021, where plaintiff demonstrated logical thought processes, intact memory, and normal psychomotor activity. The ALJ also referenced testing in March 2022, which yielded no valid data due to suboptimal task engagement. (Filing No. 8-2 at 27-28). The ALJ found that some limitation

9

of exposure to workplace stressors was warranted, but concluded Jones' opinions were less persuasive. Jones did not opine on Plaintiff's migraines.

At step four, the ALJ considered Plaintiff's past relevant work as a bartender, casino dealer, patient care attendant, and a casino supervisor, and concluded that Plaintiff was "unable to perform any past relevant work (20 CFR 404.1565 and 416.965)" as the jobs exceed the exertional requirements as actually or generally performed. (Filing No. 8-2 at 31).

At step five, the ALJ considered Plaintiff's age, education, work experience, and residual functional capacity, and determined that jobs exist in significant numbers in the national economy that Plaintiff can perform. In doing so the ALJ considered the testimony of Vocational Expert ("VE") Steve Schill. At the hearing, the ALJ asked the VE to consider a hypothetical individual with the same background as Plaintiff who: is limited to sedentary work; could never climb ropes, ladders or scaffolds; could occasionally climb ramps or stairs; could occasionally balance, stoop, kneel, crouch and crawl; would avoid workplace hazards such as unprotected heights and dangerous moving machinery; would avoid concentrated exposure to temperature extremes, witness, and vibration; and, is limited to low-stress work. (Filing No. 8-2 at 62).

The VE testified that the positions of call out operator (DOT 237.367-014), polisher of eye frames (DOT 713.684-038), and final assembler (DOT 713.687-018), are unskilled, sedentary level positions that exist in significant numbers in the national economy. If the hypothetical individual were limited to only occasional contact with the public, workers, or supervisors, the call out operator position would be eliminated, and the others would remain. (Filing No. 8-2 at 62). In that scenario, the call out operator position could be replaced by circuit board assembler (DOT 726.684-110). The VE testified that if the hypothetical individual required use of an ambulatory aid, the individual would be able to perform the essential functions of these sedentary positions. (Filing No. 8-2 at 62). The ALJ determined that the vocational expert's testimony was consistent with the information contained in the Dictionary of Occupational Titles (DOT). The ALJ noted that only

10

occasional use of a cane (a less restrictive limitation than that posed to the vocational expert), was supported by the record and the jobs listed would remain available. Based on the testimony of the VE, and considering the Plaintiff's age, education, work experience, and RFC, the ALJ determined Plaintiff was capable of making a successful adjustment to other work that exists in significant numbers in the national economy. Therefore, the ALJ determined a finding of "not disabled" was appropriate as Plaintiff had not been under a disability as defined in the Social Security Act from November 2, 2019, through the date of the ALJ decision. (Filing No. 8-2 at 32).

### IV.    STANDARD OF REVIEW

After exhausting review with the Appeals Council, a claimant is entitled to judicial review of the ALJ's decision in federal district court. *Smith v. Berryhill*, 587 U.S. 471, 475 (2019); *see also* 42 U.S.C. § 405(g). Because the Appeals Council declined review, the ALJ's decision is the final decision of the Commissioner. *See Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000). On review, the district court determines whether the Commissioner's decision complies with the relevant legal requirements or "whether substantial evidence on the record as a whole supports the ALJ's decision." *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011). Substantial evidence is "more than a mere scintilla," and means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). "'It is not the role of this court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo.'" *Dols v. Saul*, 931 F.3d at 741, 746 (8th Cir. 2019) (quoting *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007)).

Under the substantial evidence standard, the district court will consider "evidence that detracts from the [ALJ's] decision, as well as evidence that supports it." *Fentress v. Berryhill*, 854 F.3d 1016, 1020 (8th Cir. 2017) (citing *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007)). However, the district court will not reverse an ALJ's decision "simply because some evidence supports a conclusion other than that reached by the [ALJ]." *Id.*

11

(citing *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006)). The district court must also affirm the ALJ's decision "[i]f, after reviewing the record, the court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings." *Dols*, 931 F.3d at 744 (8th Cir. 2019) (quoting *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005)). Nevertheless, the court's review is "more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp'" of the Commissioner's decision. *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (internal citations omitted).

## V.    ANALYSIS

Plaintiff alleges she stopped working in 2019 primarily due to chronic low back and hip pain, which worsened over time. However, she alleges her physical condition was complicated in February 2021, with the onset of a constant headache that led her to the emergency room on multiple occasions. She alleges that she has been prescribed preventative and abortive medications and has consistently treated migraines with her primary care provider and a neurologist, but her migraines remain uncontrolled.

In this appeal, Plaintiff argues the ALJ failed to adequately support the findings regarding her migraines at steps two, three, and four of the sequential analysis, particularly with regard to the evaluation of her migraines. She requests reversal of the Commissioner's denial of Disability Insurance Benefits and Supplemental Security Income, remand for a new administrative hearing, costs and reasonable attorney's fees under the Equal Access to Justice Act. (Filing No. 16-1 at 19). In response, the Commissioner asserts Plaintiff had a fair hearing and full administrative consideration in accordance with applicable statutes and regulations, and substantial evidence on the record as a whole supports the Commissioner's decision. (Filing No. 17). The court agrees with the Commissioner.

### A. Identification of Severe Impairments at Step Two

Plaintiff argues that the ALJ made conclusory statements at step two, finding that Plaintiff's migraines were not a severe impairment. Plaintiff alleges the ALJ failed to

12

support the assessment of Plaintiff's migraines by substantial evidence. At step two, the ALJ must determine whether the claimant has a "severe impairment." 20 C.F.R. § 404.1520(a)(4)(ii). An impairment or combination of impairments is "severe" if the claimant's ability to perform "basic work activities" is significantly limited. 20 C.F.R. § 404.1520(c); *see also* 20 C.F.R. §§ 404.1522(b), 416.922(b) (defining basic work activities as "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;" "capacities for seeing, hearing, and speaking;" "[u]nderstanding, carrying out, and remembering simple instructions;" "[u]se of judgment;" "[r]esponding appropriately to supervision, co-workers and usual work situations;" and "[d]ealing with changes in a routine work setting"). The impairment or combination of impairments must also satisfy the duration requirement "of at least 12 months." See 20 C.F.R. § 404.1509. In contrast, an impairment or combination of impairments is not severe when the evidence the claimant offers establishes only a slight abnormality or a combination of slight abnormalities which has no more than a minimal effect on the claimant's ability to work. *See* Social Security Ruling 85-28 and Social Security Ruling 16-3p; *see also Laura F. v. Kijakazi*, No. 8:23CV272, 2024 WL 2050392, at \*7 (D. Neb. May 7, 2024) (citing *Bowen v. Yuckert*, 482 U.S. 137, 154 (1987)).

The regulations require that a claimant establish at least one severe impairment to avoid a denial of benefits at step two. *See* 20 C.F.R. § 404.1520(a)(4)(ii), 416.920(a)(4)(ii). Any failure of an ALJ to find an impairment to be severe at step two is harmless if the ALJ finds the claimant to suffer from another severe impairment, continues in the evaluation process, and considers the effect of the impairment at the other steps of the evaluation process. *See Gladden v. Astrue*, No. 8:12CV40, 2013 WL 149397, at \*6 (D. Neb. Jan. 14, 2013) (citing *Matlock ex rel. D.S. v. Astrue*, No. 4:11 CV 1322 FRB, 2012 WL 4109292, \*11 (E.D.Mo. Sept.19, 2012)). Here, the ALJ found multiple severe impairments at step two, including osteoarthritis of bilateral hips, neuropathy, piriformis syndrome, degenerative disc disease, mood disorder, and anxiety disorder. (Filing No. 8-2 at 19). While the ALJ did not consider Plaintiff's migraines to be a severe impairment, the ALJ

13

continued the sequential analysis and proceeded to the next step. There accordingly would be little purpose in remanding the matter for yet another step-two determination, so any error would harmless.

But even if considered, the court rejects Plaintiff's argument that the ALJ should have designated her migraines as a severe impairment. Plaintiff in particular takes issue with the ALJ's summary conclusion about migraines and argues that her analysis was insufficient for the reader "to determine from the written decision whether the ALJ properly reviewed the evidence." (Filing No. 16-1 at 12, citing *Willcockson v. Astrue,* 540 F.3d 878, 879-80 (8th Cir. 2008)). Although the ALJ is required to develop the record fully and fairly, she is not required to discuss all the evidence submitted and an ALJ's failure to cite specific evidence does not indicate that it was not considered. *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000). While the ALJ made only a brief mention of migraines at step two, the ALJ discussed Plaintiff's migraines and associated neurological testing throughout the remainder of the decision when evaluating Plaintiff's RFC, mental impairments, and the appropriate environmental limitations and accommodations. (Filing No. 8-2 at 19, 22, 23, 26, 29, 31). It is evident that the ALJ reviewed the evidence, particularly where the ALJ noted Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record…." (Filing No. 8-2 at 23).

Plaintiff's medical records contain many references to Plaintiff's migraines and headaches and it is clear that she visited the emergency room on multiple occasions. Notably, however, it was regularly noted that her headaches were often not the primary reason for the visit, but a secondary complaint or a symptom potentially brought on by other causes. For example, at a visit on September 22, 2021, Plaintiff sought treatment for pneumonia and migraine, which may have been brought on by inhaling smoke. (Filing 9-1 at 405). At a visit on July 8, 2022, Plaintiff reported chronic hip pain and foot drop. She said she got her foot caught causing her to fall and hit her head and back. (Filing No. 11-1 at 383). At a visit on July 26, 2022, Plaintiff reported concussive symptoms of headache

14

and neck soreness from a fall which occurred when she tripped on a tote. (Filing No. 11-1 at 418). At a visit on July 31, 2022, Plaintiff reported head and neck pain related to a fall from standing height when she was bent over trying to play with a dog. (Filing No. 11-1 at 424). At a visit on August 9, 2022, Plaintiff reported having "three concussions in the past few weeks due to falling." (Filing No. 11-1 at 438). At a visit on October 20, 2022, Plaintiff reported a syncopal episode and stated that she hit her head on the side of a coffee table. (Filing No. 11-1 at 470). At a visit on October 21, 2022, Plaintiff reported facial pain and headache after being struck in the face by her husky. (Filing No. 11-1 at 487). At a visit on December 5, 2022, Plaintiff reported falling over a dog gate. (Filing No. 11-1 at 623).

Upon careful review of the record, it is clear that Plaintiff's providers did not opine on the severity of Plaintiff's migraines, and her treatment notes indicated the objective testing was normal, with no acute findings. Plaintiff testified during her hearing with the ALJ that she suffers from recurrent migraines triggered by smells and that her current medication was ineffective. She did not testify as to how her migraines affected her ability to do basic work activities. While Plaintiff stated that she has cognitive difficulties, the treatment notes indicated her cognitive functioning was normal. Based upon the evidence in the record, it was reasonable for the ALJ to conclude that plaintiff's migraines were not severe.

## B. ALJ Evaluation of Migraines at Step Three

Plaintiff next argues that the ALJ failed to address the potential medical equivalence of Plaintiff's migraines at step three. (Filing No. 16-1 at 14). Step three of the sequential analysis requires the ALJ to compare the claimant's impairment or impairments to a list of impairments in 20 C.F.R. Part 404, Subpart P, App'x 1. *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d). If the claimant has an impairment "that meets or equals one of [the] listings," the analysis ends and the claimant is found to be disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii), (d). If a claimant does not suffer from a listed impairment or its equivalent, then the analysis proceeds to steps four and five. *See* 20 C.F.R. § 404.1520(a). The ALJ considered the criteria of listing 1.18 (abnormality of a major joint(s) in any extremity) due to Plaintiff's

15

severe physical impairments and listings 12.04 and 12.06 due to Plaintiff's severe mental impairments, but the ALJ did not specifically discuss a listing related to Plaintiff's migraine condition, which the ALJ found to be non-severe.

Plaintiff recognizes that there is no particular listing for migraines, but argues that the ALJ failed to consider and analyze the medically equivalent listing under 20 C.F.R. § 404, Subpart P, Appendix 1, § 11.02 for other neurological disorders, in particular for epilepsy/seizures using SSR 19-4p as a guide to determine whether Plaintiff has a medically determinable impairment of a primary headache disorder. (Filing No. 16-1 at 14, citing Soc. Sec. Ruling, SSR 19-4p; Titles II & Xvi: Evaluating Cases Involving Primary Headache Disorders, SSR 19-4P (S.S.A. Aug. 26, 2019)). Plaintiff relies heavily upon the decision in *Zuhlke v. Berryhill*, 2019 WL 3457241 (D. Neb. July 31, 2019), in which the district court found the ALJ failed to discuss the medical equivalence of Zuhlke's migraines, which had been identified as a severe impairment. Plaintiff also references the decision in *Marshall v. Comm'r of Soc. Sec. Admin.*, No. 8:23CV129, 2023 WL 8601218, at *5 (D. Neb. Dec. 12, 2023), where the court stated that the ALJ should have evaluated severe chronic migraines under 20 C.F.R., Part 404, Subpart P, Appendix 1, § 11.02 (epilepsy/seizures), and explained why the migraine condition did not medically equal the relevant listing. The facts and circumstances in those cases, however, are distinguishable from the medical evidence here.

In both of those cases, the plaintiffs provided explicit detail showing how thoroughly their migraines affected their work and activities of daily living. For example, Marshall testified that he was unable to walk his dogs, care for, dress or bathe himself, cook a meal, sleep or read. Zuhlke testified that his migraines interfered with even part-time work, made his hand tingle, and kept him awake. He testified that he could not complete a task for several days because of crippling migraines, that medication did nothing to ease his pain and he was unable to care for his children during his migraines. Zuhlke's board certified neurologist diagnosed him with migraine headaches caused by a fall off a ladder in which he struck the right side of his head on cement. *Zuhlke*, 2019 WL 3457241 at *1-

16

2, 4. The neurologist concluded to a reasonable degree of medical probability that Zuhlke's headaches would interfere with his ability to perform labor or continuous activity, in particular the condition would likely result in two to three days of work absence per week, or eight to twelve days of work per month. *See id.* at \*6-7.

The circumstances here are different. During the hearing, Plaintiff testified that she had chronic low back and hip pain that progressively worsened and required surgery. She said, related to those issues, that she had difficulty getting dressed and showering, driving, sitting or standing for long periods of time, and she treated with physical and aquatic therapy. (Filing No. 8-2 at 51-53). She testified that she was on preventative medication for her migraines and had a "rescue type medication" that could only be used a limited number of times per month. (Filing No. 8-2 at 56). She had an upcoming appointment with a neurologist and they planned to try treating with Botox. Plaintiff testified that she had headaches every day and migraines three to four times per week. Her migraines were often triggered by the smell of cigarette smoke or marijuana, so she made sure not to let her family members smoke around her. (Filing No. 8-2 at 56-57).

Notwithstanding that Plaintiff complained of recurrent migraines, there was little evidence as to how that particular condition impacted her daily life. Unlike the claimants in *Zuhlke* and *Marshall,* Plaintiff's migraines in this case were intermittent and treatment for that condition often spanned months, and treatment or complaints of headaches were often secondary to other reported issues. The records indicate that there were no appreciable focal neurological defects detected and her brain MRI was unremarkable. On January 3, 2023, Plaintiff's doctors performed brain imaging for hypothyroidism. The test was ordered by Buster and signed by Bruce Baron, D.O. (Filing No. 12-3 at 339). The MRI showed a trace of scattered chronic small vessel ischemic changes of white matter, but no acute infarct or acute ischemia. Baron noted "no sign of hematoma," no mass, no hydrocephalus or midline shift, and Plaintiff's "brain is morphologically normal." (Filing No. 11-1 at 655; Filing No. 12-3 at 338).

17

Plaintiff argues case law "caution[s] against relying on normal findings in migraine cases, instead focusing on whether the doctors questioned the severity of the claimant's headaches." (Filing No. 16-1 at 17) (citing *Gayer v. Saul,* 2020 WL 4937511 at *2 (W.D. Mo. Aug. 24, 2020)). However, Plaintiff's records and testimony provide very little objective evidence of the alleged impairment. Further, while Plaintiff's medical providers have been treating for intermittent migraine, at least one provider noted inconsistencies in how Plaintiff described her symptoms and pain, and some hospital staff expressed concern that Plaintiff displayed drug-seeking behavior. (Filing No. 11-1 at 432; Filing No. 12-3 at 290).

"The burden of proof is on the plaintiff to establish that his or her impairment meets or equals a listing. To meet a listing, an impairment must meet all of the listing's specified criteria." *Schmitt v. Kijakazi,* 27 F.4th 1353, 1358 (8th Cir. 2022). Plaintiff argues that Listing 11.02 was the listing most compatible with her migraines, but the record does not support a finding that Plaintiff meets all of the criteria in §11.02, even considering migraine as a medical equivalent for epileptic seizures. *See* 20 C.F.R., Part 404, Subpart P, Appendix 1, § 11.02; *See, also*, *Soc. Sec. Ruling, SSR 19-4p; Titles II & Xvi: Evaluating Cases Involving Primary Headache Disorders*, SSR 19-4P (S.S.A. Aug. 26, 2019).

SSR 19-4p states:

8. How do we evaluate a [medically determinable impairment (MDI)] of a primary headache disorder under the Listing of Impairments?

Primary headache disorder is not a listed impairment in the Listing of Impairments (listings); however, we may find that a primary headache disorder, alone or in combination with another impairment(s), medically equals a listing.

Epilepsy (listing 11.02) is the most closely analogous listed impairment for an MDI of a primary headache disorder. While uncommon, a person with a primary headache disorder may exhibit equivalent signs and limitations to those detailed in listing 11.02 (paragraph B or D for dyscognitive seizures), and we may find that his or her MDI(s) medically equals the listing.

Paragraph B of listing 11.02 requires dyscognitive seizures occurring at least once a week for at least 3 consecutive months despite adherence to prescribed treatment.

18

> To evaluate whether a primary headache disorder is equal in severity and duration to the criteria in 11.02B, we consider: A detailed description from an AMS [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without moving, a sleep disturbance that affects daytime activities, or other related needs and limitations).

*Id.*

In SSR 19-4p, the ICHD-3[1] diagnostic criteria for migraine without aura includes at least five headaches satisfying the following criteria:

- Lasting 4 to 72 hours (untreated or unsuccessfully treated); and,

- With at least two of the following four characteristics: 1) Unilateral location; 2) Pulsating quality; 3) Moderate or severe pain intensity; or, 4) Aggravation by or causing avoidance of routine physical activity (for example, walking or climbing stairs); and,

- During headache, at least one of the following: 1) Nausea or vomiting, or, 2) Photophobia and phonophobia.

*Id.* Plaintiff's brief asserts her migraines were accompanied by significant pain, nausea, photophobia, phonophobia, and smell sensitivity, but there is no showing that her headaches met two of the four characteristics for headache without aura. (Filing No. 16-1 at 18). Plaintiff complained of moderate or severe pain, but did not describe unilateral location, pulsating quality, or avoidance of routine physical activity. Again, Plaintiff's test results were within the normal range. Plaintiff's medical records do not support the required frequency or severity to satisfy SSR 19-4p to find medical equivalency to listing 11.02B.

---

[1] The international classification of headache disorders (3rd ed.). Soc. Sec. Ruling, Ssr 19-4p; Titles II & Xvi: Evaluating Cases Involving Primary Headache Disorders, SSR 19-4P, n. 3 (S.S.A. Aug. 26, 2019).

Additionally, Plaintiff often complained that her prescribed medication was ineffective, but clinical notes indicate she responded well to "migraine cocktails" administered in the emergency room. (Filing No. 11-1 at 8, 12, 338, 364, 391). As the ALJ noted, Plaintiff's statements concerning the intensity, persistence and limiting effects of the symptoms was not entirely consistent with the medical evidence or other evidence in the record.

The ALJ identified Plaintiff's migraines as a non-severe impairment, and as previously discussed, the ALJ did not err in that assessment. Plaintiff does not reference authority requiring the ALJ to specifically evaluate the listing for every severe or non-severe impairment listed at step two. The Eighth Circuit in *Vance v. Berryhill,* 860 F.3d 1114, 1118 (8th Cir. 2017) held "'[a]n ALJ's failure to address a specific listing or to elaborate on [her] conclusion that a claimant's impairments do not meet the listings is not reversible error if the record supports the conclusion.'" *LESLIE MARIE DETHEROW, Plaintiff, v. COMMISSIONER, SOCIAL SECURITY ADMINISTRATION, Defendant.*, No. 6:24-CV-03295-RK, 2026 WL 751747, at *7 (W.D. Mo. Mar. 17, 2026). On the other hand, "[r]emand is warranted where the ALJ's factual findings, considered in light of the record as a whole, are insufficient to permit [the] Court to conclude that substantial evidence supports the Commissioner's decision." *Id.*(citing *Hesseltine v. Colvin*, 800 F.3d 461, 466 (8th Cir. 2015)).

Upon review, the court finds the ALJ's decision reflects a thorough review of the listings for Plaintiff's *severe* physical and mental impairments, and the decision is supported by substantial evidence. The ALJ did not err in finding at step three that Plaintiff's mental impairments considered singly and in combination did not meet or equal a listed impairment. (Filing No. 8-2 at 20).

C. ALJ Evaluation of Migraines and RFC Determination in Step Four

Plaintiff lastly argues that the ALJ erred by providing no meaningful analysis of Plaintiff's migraines in assessing her RFC. "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating

physicians and others, and the claimant's own description of his or her limitations." *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009); *see also* 20 C.F.R. § 404.1545(a)(2), 416.945(a)(2) ("[w]e will consider all of your medically determinable impairments...including your medically determinable impairments that are not 'severe'...when we assess your residual functional capacity").

Plaintiff acknowledges that the ALJ determined she could perform a range of sedentary work, with additional postural, environmental and mental limitations assigned. She notes that the ALJ summarized her allegations, stated the findings of a brain MRI and concluded that limitations in exposure to light, smoke, or fumes were appropriate. Plaintiff concedes that the ALJ's summary of the MRI result was not inaccurate and that the ALJ arguably accounted for some of her symptoms. (Filing No. 16-1 at 17-18). Nonetheless, she argues that courts are to focus on whether the doctors questioned the severity of the claimant's headaches rather than relying on "normal" MRI results, and the ALJ failed to account for her pain, nausea, and phonophobia. (Filing No. 16-1 at 17 (citing *Gayer v. Saul,* 2020 WL 4937511 at *2 (W.D. Mo. Aug. 24, 2020).)

The record shows, however, that the ALJ evaluated and properly considered all of Plaintiffs severe and non-severe impairments when determining her RFC. The ALJ, for example, specifically discussed Plaintiff's medical history and added appropriate limitations in the RFC designed to avoid triggering migraines. For example, Plaintiff testified that smells were a trigger for migraines and her medical records indicated the onset of headaches and/or migraines after Plaintiff had inhaled smoke. After considering these limitations, the ALJ specifically noted that "limitations on exposure to bright or blinking lights and smoke or obnoxious fumes is warranted." (Filing No. 8-2 at 31). The record demonstrates the ALJ appropriately considered Plaintiff's migraines, particularly where they were found to be a non-severe impairment causing no more than minimal limitations on Plaintiff's ability to basic work activities. Again, "[i]t is not the role of this court to reweigh the evidence presented to the ALJ or to try the issue in this case de novo." *Dols v.*

21

*Saul*, 931 F.3d at 741, 746 (8th Cir. 2019). Upon review of the record as a whole, the court finds substantial evidence supports the ALJ's decision.

Accordingly,

IT IS ORDERED

1.  Brandy Rose Blond's Motion for Order Reversing the Commissioner's Decision is denied (Filing No. 16);

2.  Bisignano's Motion to Affirm the Commissioner's Decision is granted. (Filing No. 17);

3.  The decision of the Commissioner of the Social Security Administration is affirmed;

4.  Judgment in accordance with this memorandum and order will be entered by separate document.

Dated this 16th day of April, 2026.


BY THE COURT:


s/ Ryan C. Carson

United States Magistrate Judge

22